Jacob Markowitz, J.
Oil December 22,1965, at about 6:00 p.m., I ordered that, pending the hearing on December 27, 1965, and the determination of this proceeding, “ Columbian Presbyterian Medical Center, acting through its duly accredited and licensed physicians in attendance, may administer such transfusions as are in the opinion of the physicians in attendance necessary to save the life of Willie Mae Powell ” (emphasis added).
Mrs. Willie Mae Powell, a postoperative Caesarian section patient in Ward 16 C center, had suffered extensive bleeding and as a result had, according to the affidavit by Dr. Joseph E. Snyder, become “ critically ill and e * # been placed on the danger list.” The patient, based upon her religious beliefs as a member of Jehovah’s Witnesses, refused to give her prior written authorization for the administering of blood transfusions. In this refusal she had rebuffed the pleas of the hospital staff and of her husband and other members of her family. Mrs. Willie Mae Powell is the mother of six children. There was danger that at any moment such refusal might result in her death.
On file in the court, in addition to the affidavits submitted in connection with this application, is a memorandum as to the events and my conversations with the able counsel from Legal Aid, Carmine Coniglione, Esq., Dr. Joseph E. Snyder, and members of the family, as well as supplemental affidavits of the parties and Legal Aid.
This matter generated a barrage of legal niceties, misinformation and emotional feelings on the part of all concerned — including the court personnel.
*216 No one doubted or contested the existence of a justiciable controversy in this proceeding by Eugene Powell for injunctive relief — nor could I forget for one moment my convictions with regard to the individual’s right to be let alone or — crucially important — that a human life hung in the balance.
Never before had my judicial robe weighed so heavily on my shoulders. Years of legal training, experience and responsibility had added a new dimension to my mental processes — I, almost by reflex action, subjected the papers to the test of justiciability, jurisdiction and legality. I read Matter of President and Directors of Georgetown Coll. (331 F. 2d 1000, 1010) and was convinced of the proper course from a legal standpoint. Yet, ultimately, my decision to act to save this woman’s life was rooted in more fundamental precepts. It became clear to me that the crux of the problem lay, not in Mrs. Powell’s religious convictions, but in her refusal to sign a prior written authorization for the transfusion of blood. She did not object to receiving the treatment involved — she would not, however, direct its use. I was also convinced that the hospital, having obtained a signed release of liability from any consequences flowing from the failure to administer blood transfusions, took the view that it had fulfilled its obligations to this patient and would not, under these circumstances, administer blood transfusions even if necessary to save the patient’s life.
How legalistic minded our society has become, and what an ultra-legalistic maze we have created to the extent that society and the individual have become enmeshed and paralyzed by its unrealistic entanglements!
I was reminded of “ The Fall ” by Camus, and I knew that no release - — -no legalistic absolution — would absolve me or the court from responsibility if I, speaking for the court, answered “ No ” to the question “ Am I my brother’s keeper? ” This woman wanted to live. I could not let her die!