OPINION OF THE COURT
Leo F. Hayes, J.
The above matter appeared on the Special Term Calendar on January 14th. Due to the extreme urgency of this situation, as will become apparent, the court conducted a hearing yesterday, Monday, January 14th, at the request of the parties.
The questions presented in his petition need to be resolved immediately inasmuch as they concern the conduct of medical procedures which will be performed as early as Thursday, January 17th.
THE FACTS
The testimony establishes the following facts:
(1) In accordance with their religious beliefs, the respondents are unwilling to consent to the transfusions of any blood products.
(2) Stacey Paddock is pregnant. She has what is known as an intrauterine pregnancy which is further complicated by the fact that she is anemic, by her Rh-negative blood type and by the anterior position of her placenta. Furthermore, according to her attending physician, Dr. M. Robert Neulander, her blood count is already low.
(4) Due to these complications delivery will have to proceed by cesarean section, which is itself a surgical procedure. The baby will be born premature due to the need to interdict the mounting pressure on its brain caused by fluid buildup (hydrocephalus).
*102 (5) The Paddocks want all necessary surgical procedures to be carried out by their physicians at Crouse Irving Memorial Hospital with the exception of blood transfusions.
(6) Crouse Irving Memorial Hospital brought this petition seeking an order authorizing necessary blood transfusions to both mother and child because of the Paddock’s stated objection to transfusions.
(7) According to the uncontroverted testimony of the attending physician, Dr. Neulander, the delivery of Mrs. Paddock’s baby by cesarean section may entail her loss of a life-threatening amount of blood. Excessive blood loss is especially likely in Mrs. Paddock’s case because it will be necessary to cut her placenta, normally the site of blood loss even without cutting. Dr. Neulander wants authorization to administer blood transfusions as necessary to safeguard Mrs. Paddock’s life.
(9) Neither Stacey nor Scott Paddock will consent to blood transfusions even though they understand the medical realities outlined above. Both premise their refusal on deeply held religious beliefs.
THE LAW
A. BLOOD TRANSFUSIONS TO SAFEGUARD THE baby’s LIFE AND HEALTH
The highest court of this State has made it clear that the State has a vital interest in the welfare of children, an interest that will override even the parents’ most fervently held religious beliefs: “A parent or guardian has a right to consent to medical treatment on behalf of an infant (Public Health Law, § 2504, subd 2). The parent, however, may not deprive a child of lifesaving treatment, however well intentioned (Matter of Sampson, 29 NY2d 900; Matter of Vasko, 238 App Div 128; Matter of Santos v Goldstein, 16 AD2d 755, mot for lv to app dsmd 12 NY2d 642; cf. Matter of Hofbauer, 47 NY2d 648). Even when the parents’ decision to decline necessary treatment is based on constitutional grounds, such as religious beliefs, it must yield to the State’s interests, as parens patriae, in protecting the health and welfare of the child (Matter of Sampson, supra; Jehovah’s Witnesses v King County Hosp. Unit, 390 US 598, affg 278 F Supp 488; People ex rel. Wallace v Labrenz, 411 Ill 618, cert den 344 US 824; Power of Public Authorities to Order Medical Care for A Child Over Objection of Parent or Guardian, Ann., 30 ALR 2d 1138; cf. Prince v Massachusetts, 321 US 158). Of course it is not for the courts to determine the most ‘effective’ treatment when *103 the parents have chosen among reasonable alternatives (Matter of Hofbauer, 47 NY2d 648, supra). But the courts may not permit a parent to deny a child all treatment for a condition which threatens his life (compare Custody of A Minor, 375 Mass 733, with Matter of Hofbauer, supra, p 656). The case of a child who may bleed to death because of the parents’ refusal to authorize a blood transfusion presents the classic example (Jehovah’s Witnesses v King County Hosp., supra; Matter of Sampson, supra).” (Matter of Storar, 52 NY2d 363, 381-382.)
Accordingly, it is the judgment of this court that the hospital and attending physicians be authorized to give blood transfusions as medically indicated above.
B. BLOOD TRANSFUSIONS TO SAFEGUARD THE mother’s WELFARE
We start with the premise that every adult of sound mind has the right to determine what happens to his own body. This means that we have the individual right to refuse unwanted medical treatment (Schloendorff v Society of N. Y. Hosp., 211 NY 125). Therefore, absent some overriding State interest, blood transfusions should not be ordered in the face of a patient’s religious objections (see, Matter of Osborne, 294 A2d 372 [DC App]; cf. In re Brooks, 32 Ill 2d 361, 205 NE2d 435).
Mrs. Paddock is an adult obviously of sound mind and deep religious conviction. Yet she is asking the hospital and her doctors not simply to withhold blood transfusions; she wants them to undertake a surgical procedure which may well result in her loss of a life-threatening amount of blood. She wants the hospital and her doctors to take aggressive medical steps to insure a proper delivery, but does not want the medical personnel to correct a possible grave condition which may unavoidably be encountered in the process. This, it seems to me, puts the hospital and her doctors in an untenable position. It has been observed that “A hospital is not the patient’s servant, subject to his orders. The hospital shares the physician’s independence of judgment and responsibility for action, and to let a patient die runs counter to the reason for the hospital’s existence.” (Lifesaving Treatment for Unwilling Patients, 36 Fordham L Rev 695, 701.)
The court observed this same dilemma in the notable case of Matter of President & Directors of Georgetown Coll. (331 F2d 1000,1009): “A third set of considerations involved the position of the doctors and the hospital. Mrs. Jones was their responsibility to treat. The hospital doctors had the choice of administering *104 the proper treatment or letting Mrs. Jones die in the hospital bed, thus exposing themselves, and the hospital, to the risk of civil and criminal liability in either case. It is not certain that Mrs. Jones had any authority to put the hospital and its doctors to this impossible choice. The normal principle that an adult patient directs her doctors is based on notions of commercial contract which may have less relevance to life-or-death emergencies. It is not clear just where a patient would derive her authority to command her doctor to treat her under limitations which would produce death.”
When a patient puts her doctor in charge of a surgical procedure, she necessarily makes him responsible for the conduct of the operation. Every such grant of responsibility should be accompanied by authority sufficient to properly carry out the delegated responsibilities. Certainly if the medical personnel are requested to undertake a delivery which will entail incisions and this is known to the patient, the attending physicians must be permitted to stabilize the patient from the resulting loss of blood.
It is my judgment therefore that the attending physicians may continue to administer blood transfusions to Mrs. Paddock even after the moment of delivery as is necessary to stabilize her condition.
Mrs. Paddock’s freedom to direct the course of her own treatment shall be interdicted only in the postoperative period, and only for so long as is medically indicated to stabilize her condition.