510 A.2d 562

**MERCY HOSPITAL, INC.**

v.

**Ernestine JACKSON.**

**No. 88, Sept. Term, 1985.**

Court of Appeals of Maryland.

June 30, 1986.

Michael J. Travieso (Christopher J. Fritz, Gallagher, Evelius & Jones, on brief) Baltimore, for appellant.

Barbara B. Mello, American Civil Liberties Union of Md., Baltimore, for appellee.

Argued before SMITH, ELDRIDGE, COLE, RODOWSKY, COUCH and McAULIFFE, JJ., and CHARLES E. ORTH, JR., Associate Judge of the Court of Appeals of Maryland (retired), Specially Assigned.

ELDRIDGE, Judge.

Mercy Hospital and Ernestine Jackson have asked us to answer some fundamental questions concerning the limits, if any, of Mrs. Jackson's constitutional right to refuse a blood transfusion. The case, however, is now moot. Furthermore, for reasons hereafter set forth, this is not one of those rare instances in which it would be appropriate for the Court to express its views concerning the merits of a moot controversy.

## I.

Ernestine Jackson has been married for two years to Charles Jackson. At the time when the present controversy arose, she had no children but was pregnant. Mrs. Jackson and her husband are Jehovah's Witnesses. She was reared in that faith by her parents, has studied its tenets since the age of nine or ten, has been attending the Kingdom Hall Church for many years, and believes strongly in her religion.

When asked why she did not want to accept a blood transfusion, Mrs. Jackson answered, "Because of what I had learned from the Bible. It has, Jehovah always has

told people straight from the Bible to sustain from blood." When asked if she would accept the risk of death rather than receive a blood transfusion, Mrs. Jackson said, "Yeah, because I do believe in Jehovah, and I know he will help me." Mrs. Jackson has had occasion to weigh her beliefs before—she had previously undergone surgery for a myoma of the uterus in connection with an earlier unsuccessful pregnancy which ended with premature labor. In addition, her mother apparently underwent surgical removal of a kidney without consenting to a blood transfusion. Mrs. Jackson discussed her views with all of her doctors after the onset of her pregnancy, and with four ministers on this particular occasion. She was aware that refusing the transfusion could very well result in death.[1]

On February 24, 1984, when she was about 25 weeks pregnant, Mrs. Jackson began to go into premature labor. She first went to University of Maryland Hospital in Baltimore. Unsuccessful in obtaining full treatment there without consenting to a blood transfusion, Mrs. Jackson on February 26th went to Mercy Hospital in Baltimore.

Her doctors found that her baby was lying in an oblique to transverse position with the placenta anterior and in the lower segment of the uterus. Dr. Joseph Morris, the Chief Resident of the OB/GYN service at Mercy Hospital, advised that the baby be delivered by Caesarian section for several reasons. The baby's position in the womb weighed against vaginal delivery. Vaginal delivery would expose the premature baby to birth trauma. Vaginal delivery would also pose a risk of a ruptured uterus in Mrs. Jackson's case, because her uterus had been weakened by earlier surgery to remove a myoma, a tumor consisting of muscle tissue. Whichever method of delivery was chosen, the risk of needing a blood transfusion was significant, because of the position of the placenta near the area where the Caesarian

---

1. Mrs. Jackson's doctor stated that he had no question about her mental capacity and that she was alert, oriented, and capable of making decisions.

incision would be made, and because of the possibility of a ruptured uterus during labor. Dr. Morris testified that if Mrs. Jackson lost too much blood she would have cardiac arrest, and that it would not be possible to stop and review the decision not to give a transfusion with the family or the patient. He also stated that artificial blood products acceptable to Jehovah's Witnesses would not supply the needed hemoglobin.

Nevertheless, Mrs. Jackson refused to consent to a blood transfusion. Her husband Charles and her father-in-law were with her at the hospital. Charles Jackson took the position that he would accept any decision his wife chose to make and that he would support the infant if his wife died. Mr. Jackson, 25 at the time, is a high school graduate, is employed as an "assistant service manager" at a retail store, and shares a house with his parents.

Mercy Hospital then orally petitioned the Circuit Court for Baltimore City for appointment of a temporary guardian of the person of Mrs. Jackson with authority to consent on her behalf to any medically necessary blood transfusion. The Court appointed an attorney for Mrs. Jackson and held a hearing, at which the facts recounted above were elicited. The circuit judge declined to appoint a temporary guardian and ordered that no blood transfusion be given to Mrs. Jackson. Dr. Morris immediately delivered Mrs. Jackson's baby girl by Caesarian section without a blood transfusion, and both survived and have since been released from the hospital.

Thereafter, Mercy filed a written petition, *nunc pro tunc,* seeking appointment of a temporary guardian for Mrs. Jackson with authority to consent to a blood transfusion. On March 5, 1984, the trial judge issued a Memorandum and Order denying Mercy's petition. Mercy then appealed to the Court of Special Appeals.

Mrs. Jackson filed a motion in the Court of Special Appeals asking the court to dismiss the appeal as moot, arguing that because she had left Mercy Hospital, because

she no longer requires the medical treatment at issue here, and because she is extremely unlikely to seek such treatment from Mercy Hospital again, there no longer exists a controversy between the parties for which the court could fashion a remedy. The Hospital contended that the issues presented could recur and should be decided. The Court of Special Appeals took this latter view, reached the merits, and affirmed the trial judge's decision. *Mercy Hosp. v. Jackson*, 62 Md.App. 409, 489 A.2d 1130 (1985). Thereafter we granted Mercy Hospital's petition for a writ of certiorari.

## II.

In addition to the briefs and oral arguments by the parties, amici briefs have been filed by the State of Maryland and the University of Maryland Medical System Corporation. Both the merits of the case and the matter of mootness have been thoroughly briefed and argued.

Mercy Hospital and the amici urge that we decide the merits. Mercy's position is that Mrs. Jackson's First Amendment right to religious freedom must be balanced against various "state interests [which] include the preservation of life, the protection of innocent third parties such as minor and unborn children from the loss of a parent, and maintaining the ethical integrity of the medical profession." (Petitioner's brief p. 9). In Mercy's view, "the Court of Special Appeals erred in holding that [Mrs. Jackson's] religious claim outweighed the State of Maryland's interest in preserving [Mrs. Jackson's] own life, protecting the welfare of [her] child, and maintaining the integrity of the health care delivery system, including the integrity of Mercy Hospital and its staff." (*Id.* at pp. 9–10). The University of Maryland Medical System Corporation takes essentially the same position.

Counsel for Mrs. Jackson stated at oral argument that Mrs. Jackson has changed her view somewhat since filing in the Court of Special Appeals the motion to dismiss, and now

believes that the merits of the case should be decided. Nonetheless, counsel frankly stated that she has serious doubts concerning the frequency with which these cases will arise, and that even if we reject Mercy Hospital's position in this case, Mercy and other hospitals will continue to seek court orders and will distinguish the instant case in light of its particular facts. In arguing for affirmance of the decisions below, Mrs. Jackson maintains that the "constitutional right of free exercise of religion forbids a state court to order a blood transfusion over the religious objection of a pregnant woman when only the life of the mother, not that of the fetus, is endangered." (Respondent's brief p. 7). Mrs. Jackson also relies upon the "constitutional right of privacy" as delineated in *Griswold v. Connecticut*, 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965); *Roe v. Wade*, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973), and other cases. In addition, Mrs. Jackson invokes the doctrine of "informed consent" recognized in *Sard v. Hardy*, 281 Md. 432, 379 A.2d 1014 (1977). The State of Maryland likewise contends that the decisions below were correct, relying upon Mrs. Jackson's constitutional right freely to exercise her religious beliefs and constitutional "right of bodily privacy."

### III.

■ As this Court pointed out in *Attorney Gen. v. A.A. School Bus*, 286 Md. 324, 327, 407 A.2d 749 (1979), "A question is moot if, at the time it is before the court, there is no longer an existing controversy between the parties, so that there is no longer any effective remedy which the court can provide." It is undisputed that the present case is moot under this standard. There is no longer a controversy between Mercy Hospital and Mrs. Jackson over consent to a blood transfusion. Nothing that we say will bind the parties to any future course of action or will affect or remedy what has already taken place.

■ This Court has the constitutional authority to express its views on the merits of a moot case, *Reyes v. Prince George's County,* 281 Md. 279, 291–299, 380 A.2d 12 (1977). Nevertheless, as Judge Digges stated for the Court in *Reyes,* "we will exercise this authority only in rare instances which demonstrate the most compelling of circumstances." 281 Md. at 297, 380 A.2d 12.

Therefore, generally when a case becomes moot, we order that the appeal or the case be dismissed without expressing our views on the merits of the controversy. *See, e.g., Comm'n On Human Relations v. Mass Transit,* 303 Md. 416, 494 A.2d 210 (1985); *County Comm'rs v. Secretary of Health,* 302 Md. 566, 489 A.2d 1127 (1985); *Nat'l Collegiate Athletic Ass'n v. Tucker,* 300 Md. 156, 159, 476 A.2d 1160 (1984); *Koontz v. Ass'n of Classified Emp.,* 297 Md. 521, 529–530, 467 A.2d 753 (1983); *Hagerstown Repro. Health Serv. v. Fritz,* 295 Md. 268, 454 A.2d 846, *cert. denied,* 463 U.S. 1208, 103 S.Ct. 3538, 77 L.Ed.2d 1389 (1983); *News American v. State,* 294 Md. 30, 38–39, 447 A.2d 1264 (1982); *Kindley v. Governor of Maryland,* 289 Md. 620, 631, 426 A.2d 908 (1981); *Rockville Grosvenor, Inc. v. Mont. Co.,* 289 Md. 74, 84–85, 422 A.2d 353 (1980); *Lloyd v. Supervisors of Elections,* 206 Md. 36, 111 A.2d 379 (1954); *State v. Shields,* 49 Md. 301 (1878). As Chief Judge Murphy explained the rule, writing for the Court in *State v. Ficker,* 266 Md. 500, 506–507, 295 A.2d 231 (1972), "[a]ppellate courts do not sit to give opinions on abstract propositions or moot questions, and appeals which present nothing else for decision are dismissed as a matter of course."

The "rare instances" [2] when the Court will express its views in moot controversies, were articulated for the Court by Judge Hammond in *Lloyd v. Supervisors of Elections, supra,* 206 Md. at 43, 111 A.2d 379, as follows:

"... only where the urgency of establishing a rule of future conduct in matters of important public concern is

---

2. *Reyes,* 281 Md. at 297, 380 A.2d 12.

imperative and manifest, will there be justified a departure from the general rule and practice of not deciding academic questions.... [I]f the public interest clearly will be hurt if the question is not immediately decided, if the matter involved is likely to recur frequently, and its recurrence will involve a relationship between government and its citizens, or a duty of government, and upon any recurrence, the same difficulty which prevented the appeal at hand from being heard in time is likely again to prevent a decision, then the Court may find justification for deciding the issues raised by a question which has become moot, particularly if all these factors concur with sufficient weight."

In our opinion, the instant case fails to meet the criteria for departing from the general rule. Ten years ago, in the only other case to come before this Court involving the claimed constitutional right of a Jehovah's Witness to refuse a blood transfusion during surgery, where the plaintiff sought a declaration of rights even though the controversy had terminated with the completion of the operation, this Court stated (*Hamilton v. McAuliffe*, 277 Md. 336, 341, 353 A.2d 634 (1976)):

"Whether an individual has the right to refuse a blood transfusion necessarily turns upon the facts existing at the moment. *See* Anno., 9 A.L.R. 3d 1391 (1966). The declaratory judgment process is therefore ill fitted as a vehicle to declare the rights of parties in future circumstances as yet unknown."

■ What was said in the *Hamilton* case is just as apt today. In considering the various interests at stake when a hospital patient declines a medically indicated blood transfusion, any decision must take into account the factual circumstances in which the asserted rights come into play. A ruling on the merits of this case could be so easily distinguished by future litigants that it would afford little guidance to trial judges or parties. Clearly where the answers to moot questions have no general application, we should

not answer them. *Lake Fls. Assn. v. Bd. of Zon. Appeals*, 209 Md. 561, 565, 121 A.2d 809 (1956).

While similar blood transfusion controversies may recur in Maryland on occasion, each such matter is distinct and largely dependent upon its own facts. Cases from other jurisdictions bear this out. *See Application of President & Directors of Georgetown College*, 331 F.2d 1000, 1008 (D.C. Cir.) (patient *"in extremis* and hardly *compos mentis "*), *cert. denied,* 377 U.S. 978, 84 S.Ct. 1883, 12 L.Ed.2d 746 (1964); *In re Osborne,* 294 A.2d 372 (D.C.1972) (competent adult; family concurrence); *St. Mary's Hosp. v. Ramsey,* 465 So.2d 666 (Fla.Dist.Ct.App.1985) (competent adult with kidney disease and child support obligation); *In Re Estate of Brooks,* 32 Ill.2d 361, 205 N.E.2d 435 (1965) (adult, allegedly incompetent); *John F. Kennedy Memorial Hospital v. Heston,* 58 N.J. 576, 279 A.2d 670 (1971) (patient in shock on arrival at hospital); *Raleigh Fitkin-Paul Morgan Memorial Hosp. v. Anderson,* 42 N.J. 421, 201 A.2d 537 (pregnant woman), *cert. denied,* 377 U.S. 985, 84 S.Ct. 1894, 12 L.Ed.2d 1032 (1964); *Matter of Storar,* 52 N.Y.2d 363, 438 N.Y.S.2d 266, 420 N.E.2d 64 (retarded fifty-two year old with terminal cancer), *cert. denied,* 454 U.S. 858, 102 S.Ct. 309, 70 L.Ed.2d 153 (1981); *Crouse Irving Memorial Hospital v. Paddock,* 127 Misc.2d 101, 485 N.Y.S.2d 443 (Sup.Ct. 1985) (transfusion given to save child; continued to stabilize mother); *Matter of Melideo,* 88 Misc.2d 974, 390 N.Y.S.2d 523 (Sup.Ct.1976) (childless woman; husband concurred); *Powell v. Columbian Med. Center,* 49 Misc.2d 215, 267 N.Y.S.2d 450 (Sup.Ct.1965) (mother with large family, all desiring her to accept blood, acquiesced in court order, but would not give consent); *Erickson v. Dilgard,* 44 Misc.2d 27, 252 N.Y.S.2d 705 (Sup.Ct.1962) (elderly adult refused consent, son concurred); *Holmes v. Silver Cross Hospital of Joliet, Illinois,* 340 F.Supp. 125 (N.D.Ill.1972) (motion to dismiss wrongful transfusion suit denied); *United States v. George,* 239 F.Supp. 752 (D.Conn.1965) (patient acquiesced in court order).

In addition to the general rule against resolving the merits of moot cases, this Court's established policy is to decide constitutional issues only when necessary. *Rutherford v. Rutherford*, 296 Md. 347, 364 n. 6 (majority opinion), 366–367 (dissenting opinion), 464 A.2d 228, 237 (1983), and cases there cited. This policy is especially strong with regard to difficult constitutional questions not capable of easy resolution. *County Exec., Prince Geo's Co. v. Doe*, 300 Md. 445, 460 n. 13, 479 A.2d 352 (1984). The constitutional issues in the case at bar, involving the Free Exercise Clause of the First Amendment and the right of privacy recognized by the Supreme Court in *Roe v. Wade, supra*, are among the most difficult constitutional issues raised in litigation. To attempt to resolve such matters unnecessarily, when no actual controversy between the parties exists, would be contrary to this State's established appellate policy.

For these reasons, the Court of Special Appeals should not have decided this controversy and we shall not do so.

JUDGMENT OF THE COURT OF SPECIAL APPEALS VACATED, AND CASE REMANDED TO THAT COURT WITH DIRECTIONS TO DISMISS THE APPEAL. PETITIONER TO PAY COSTS.

SMITH and McAULIFFE, JJ., dissent.

McAULIFFE, Judge, dissenting.

This case, while clearly moot, presents a textbook example of when an appellate court should express its view on the merits of the questions involved. Squarely presented and ably briefed and argued are important questions of substantial public concern "capable of repetition, yet evading review." *So. Pac. Terminal Co. v. Int. Comm. Comm.*, 219 U.S. 498, 515, 31 S.Ct. 279, 283, 55 L.Ed. 310 (1911). *See Super Tire Engineering Co. v. McCorkle*, 416 U.S. 115, 125, 94 S.Ct. 1694, 712–13, 40 L.Ed.2d 1 (1974); *Roe v. Wade*, 410 U.S. 113, 125, 93 S.Ct. 705, 1699, 35 L.Ed.2d 147 (1973).

This Court has made it clear that where there is an urgency to establish a rule of future conduct on a matter of public concern, we will express our views on the questions presented by a moot case. *Jones v. State*, 302 Md. 153, 158, 486 A.2d 184 (1985). The general rule was well stated by Judge Davidson for the Court in *Attorney Gen. v. A.A. Co. School Bus*, 286 Md. 324, 328, 407 A.2d 749 (1979):

> [A] court may decide a moot question where there is an imperative and manifest urgency to establish a rule of future conduct in matters of important public concern, which may frequently recur, and which, because of inherent time constraints, may not be able to be afforded complete appellate review.

*See also State v. Ficker*, 266 Md. 500, 507, 295 A.2d 231 (1972); *Lloyd v. Supervisors of Elections*, 206 Md. 36, 43, 111 A.2d 379 (1954).

In *Hamilton v. McAuliffe*, 277 Md. 336, 353 A.2d 634 (1976), this Court refused to permit the resolution by declaratory judgment of issues similar to those involved here, pointing out that the petitioner had not sought certiorari after dismissal of his direct appeal. Commenting on the failure of petitioner to seek certiorari, the Court said, "[w]e note that, in a proper case, mootness need not prevent appellate review of the merits." 277 Md. at 341 n. 3, 353 A.2d 634. Cited as authority for that statement, among other cases, were *Roe v. Wade, supra*, and *John F. Kennedy Memorial Hospital v. Heston*, 58 N.J. 576, 279 A.2d 670 (1971). Interestingly, *Heston* involves similar issues, and represents a determination by the Supreme Court of New Jersey that the public importance of the issues justified a decision even though the case was moot.

I do not understand the majority to say that this case fails to bring before us matters of important public concern. Indeed, the Court concedes that resolution of the issues here presented necessarily involves the weighing and balancing of substantial state interests against fundamental individual rights of constitutional dimension. Certainly the issues generated by this case are more compelling than the

question of whether an accessory before the fact might be convicted of a greater crime than that of which his principal was convicted, and yet this Court just last year found it appropriate to address the latter issue through the vehicle of a moot case. *Jones v. State, supra.*

I do not read the majority opinion as suggesting that these issues are likely to come before us for resolution in a case that is not moot. These cases arise under emergency conditions, usually requiring a decision by a trial judge within a matter of hours. The procedures of this Court, even when expedited to accommodate matters that must be decided promptly, are incapable of bringing about adequate briefing, oral argument, and a decision within the time required for proper resolution of these cases. *See Roe v. Wade, supra,* 410 U.S. at 125, 93 S.Ct. at 712–13. Moreover, where the issues are as complex and as difficult as those inevitably involved in a case of this kind, we should embrace the procedure that permits unhurried contemplation over that which mandates a rush to judgment.

I conclude, then, that the Court's concern must be that the issues involved in this case are not likely to recur. I disagree. The precise facts of this case may not recur, but the fundamental issues will. While there is a regrettable paucity of authority from state courts of last resort in cases of this type, the literature demonstrates that the problem is a recurring one, and that trial judges, attorneys, health care providers, and other interested persons are in immediate need of guidance.

That we cannot resolve every issue in a single case is hardly reason to refuse to begin. No single search and seizure case serves as a rosetta stone to translate the meaning of the Fourth Amendment to every other case. Some areas of the law do not lend themselves to resolution by broad legislation, but are best developed through a case by case approach. This case affords the Court an excellent opportunity to address major issues that need to be resolved.

It is ironic that the feature which dissuades the majority—the involvement of "difficult constitutional questions not capable of easy resolution"—is precisely that which persuades me there is a pressing need for guidance from this Court. Each party and amicus seeks a decision, and none has suggested we avoid the difficult issues on the ground of mootness, or that the issues are likely to reach us in a case that is not moot. At an earlier stage Appellee suggested mootness, but she has withdrawn that argument in express recognition of the public interest involved in the resolution of this case. We exist as a certiorari court to grapple with just such difficult issues, and we ought not turn aside from them.

I am authorized to state that SMITH, J., concurs with the views expressed herein.