533 A.2d 611 (1987)
In re A.C., Appellant.
No. 87-609.
District of Columbia Court of Appeals.
Argued June 16, 1987.
Decided June 16, 1987.
Opinion Filed November 10, 1987.
Robert E. Sylvester, Washington, D.C., for appellant A.C.
Barbara F. Mishkin, Washington, D.C., for respondent fetus.
Vincent C. Burke, for appellees George Washington University and George Washington University Hosp.; Jack M. Frazier, Washington, D.C., was also present.
Richard S. Love, Asst. Corp. Counsel, for District of Columbia, intervenor as parens patriae, for the fetus; Barbara J. Mann, Asst. Corp. Counsel, Washington, D.C., was also present.
Elizabeth Symonds, Washington, D.C., with whom Lynn M. Paltrow and Janet Benshoof, New York City, were on the Memorandum in Response to the Court's Order to be Informed of Further Developments, for amicus curiae American Civil Liberties Union Foundation.
Before BELSON and TERRY, Associate Judges, and NEBEKER, Associate Judge, Retired.[*]
NEBEKER, Associate Judge, Retired:
This appeal presented an emergency request for a stay of a Superior Court order permitting a Caesarean section on a terminally ill woman who was in extremis. This opinion is written after the fact; its purpose is to assist others and to test this court's decision with analysis of precedent some of which was not considered at the time of decision. Counsel are commended for their assistance to the courtstrial and appellate. Condolences are extended to those who lost the mother and child.
*612 History tells us that innumerable health care emergency issues used to be decided within the family and medical circle. In the past few decades, for reasons similar to many of those prompting expanded recourse to the courts generally, health care providers have sought equitable or declaratory action approving or directing active or passive treatment of ill or injured patients. These patientssometimes with family or friends in attendanceare often in extremis; some are not conscious or are otherwise unable to express present desire; some are minors or, as here, in fetal state.
Complex issueslegal, moral and religiousare presented, and courts, though they must under present circumstances, are often hard pressed to arrive at a right answer. The courts do, however, make the final mortal decision. That is, in itself, probably the best that can be said of the process. It would be far better if, by legislation, these bio-ethical decisions could be made by duly constituted and informed ethical groups within the health care system, and if desired, appellate review as provided in other administrative proceedings. In this way, the need to attempt to inform judges of, to them, complex medical facts on very short notice could be eliminated.
On June 16, 1987, George Washington University and George Washington University Hospital (the hospital) sought a declaratory order from the Superior Court "as to what it should do in terms of the fetus, whether to intervene [by Caesarean section] and save its life." The trial court, after a hearing at the hospital, determined that the hospital should proceed with the operation, and an appeal was taken and a stay sought. Later that day, after a telephone conference call hearing, this court issued an order denying the motion for stay. That order effectively ended the appeal; the operation was performed, and the child and mother died soon thereafter.

I.
A.C. was diagnosed with leukemia when she was thirteen years old. As part of her treatment, she underwent a number of major surgical procedures, therapy, and chemotherapy. When she was twenty-seven years old, after her cancer had been in remission for three years, A.C. married. At the time she became pregnant, she had not undergone chemotherapy for more than a year. In her fifteenth week of pregnancy, she was referred to the hospital's highrisk pregnancy clinic.
When A.C. was approximately twenty-five weeks pregnant, she went to her regularly scheduled prenatal visit complaining of shortness of breath and some pain in her back. Her physicians subsequently discovered that she had a tumor mass in her lung which was most likely a metastatic oxygenic carcinoma. She was admitted to the hospital on June 11 and her prognosis was terminal.
On June 15, during A.C.'s twenty-sixth week of pregnancy, A.C., her physicians, her mother, and her husband discussed the possibility of providing A.C. with radiation therapy or chemotherapy to relieve her pain and to continue her pregnancy. Her physicians believed that her unborn child's chances of viability would be greatly increased if it were delivered when it had reached twenty-eight weeks gestational age. By June 16, the date on which the hospital sought the declaratory order in the Superior Court, A.C. had been heavily sedated so that she could continue to breathe. Her condition was declining, and the attending medical staff concluded that passive treatment was appropriate because the mother would not survive and the child's chances of survival were grim. The hospital administration then decided to test this decision in the Superior Court.
The trial court appointed counsel for A.C. and the fetus, respectively. The District of Columbia was permitted to intervene for the fetus as parens patriae. A hearing was held at the hospital and was transcribed.
There was some dispute about whether A.C. would have chosen to have a Caesarean section on June 16. Before she was sedated, A.C. indicated that she would choose to relinquish her life so that the fetus could survive should such a choice present itself at the fetus' gestational age *613 of twenty-eight weeks. Her physicians never discussed with her what her choice would be if such a choice had to be made before the fetus reached the twenty-eight-week point. The fetus was suffering oxygen starvation and resultant rapid heart rate. There was at that point less than 20 percent chance that it would be afflicted with cerebral palsy, neurological defects, deafness and blindness. There was not a clear medical consensus on the course of A.C.'s treatment. Those physicians who objected to the proposed surgery did so because A.C. refused her consent to the procedure, not because the surgery was medically objectionable. One physician testified that he believed that A.C. would not have wanted to deliver a baby that might have to undergo the pain of having handicaps that are associated with premature delivery. Another physician believed that A.C. would not have refused permission for the Caesarean section to be performed. During the course of her pregnancy, however, A.C. was aware that a number of medications she was taking might harm the fetus. Nevertheless, she expressed a desire to her physicians to be kept as comfortable as possible throughout her pregnancy and to maintain the quality of her life.
The trial court determined that the fetus was viable and that the District of Columbia had an interest in protecting the potential life of the fetus. See Roe v. Wade, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973). Relying on an earlier Superior Court decision, In re Maydun, 114 Daily Wash.L.Rptr. 2233 (D.C.Super.Ct. July 26, 1986),[1] the court decided that the Caesarean section should be performed.
Shortly after the trial judge made his decision, A.C. was informed of it. She stated, during a period of lucidity, that she would agree to the surgery although she might not survive it. When another physician went to A.C. to verify her decision, she apparently changed her mind, mouthing the words, "I don't want it done." There was no explanation for either decision.
After our Clerk was advised of the desire to appeal, a telephonic hearing was had before a hastily assembled division of the court. The trial judge's findings were read to us, and we heard from counsel and an attending physician. The latter answered questions respecting the relative chances of survival of both A.C. and the fetus with and without the surgery. He also informed us of the rapid decline of A.C. and the need to proceed promptly with the surgery, if it was decided to do so. There was no time to have the transcript read or to do effective research. The atypical nature of the appellate hearing included our hearing directly from one of the physicians.
The court based its decision to deny a stay on the medical judgment that A.C. would not survive for a significant time after the surgery and that the fetus had a better, though slim, chance if taken before A.C.'s imminent death. If A.C. died before delivery, the fetus would die as well. Though A.C. might have lived twenty-four to forty-eight hours, the surgery might have hastened her death. The ordinary question of likelihood of ultimate success on the merits was deemed subsumed in the immediate necessity to balance the delicate interests of fetus survival with the mother's condition and options on her behalf.
In retrospect, we must acknowledge that any attempt to use rules on stay procedures places appellate form over substance. No appeal in this case could mature. We decided the entire matter when we denied the stay.

II.
We could begin our analysis of the law, which some may reasonably hold to be self-justifying, by testing ordinary rules for a stay against these facts. And we well know that we may have shortened *614 A.C.'s life span by a few hours. We do not think we should opine whether the decision would have or should have been different if her quality of life during that period had been better than it was.
In recent years, a number of commentators have written on the propriety of court-ordered Caesarean sections. See, e.g., Bowes and Selgestad, Fetal Versus Maternal Rights: Medical and Legal Perspectives, 58 Obstetrics & Gynecology 209 (1981); Gallagher, Prenatal Invasions & Interventions: What's Wrong With Fetal Rights, 10 HARV. WOMEN: L.J. 9 (1987); Rhoden, The Judge in the Delivery Room: The Emergence of Court-Ordered Caesareans, 74 CALIF.L.REV. 1951 (1986); Note, Family LawCourt-Ordered Surgery for the Protection of a Viable Fetus, 5 W.NEW ENG.L.REV. 125 (1982). These articles and notes demonstrate the difficult task a court faces when presented with a woman whose significant interest in her bodily integrity must be balanced against the state's interest in potential human life. It is, of course, always preferable to avoid a court order at odds with the medical judgment of the doctor who will carry it out.
This is a case of first impression for this court. In fact, only one other appellate court in the nation has reported that it squarely addressed the issue of whether and when a court should order or permit that a Caesarean section be performed on a woman. See Jefferson v. Griffin Spalding County Hosp. Auth., 247 Ga. 86, 274 S.E. 2d 457 (1981).[2]Jefferson is of limited help for our purposes. Here, the mother was not near term for delivery; in Jefferson, the mother was at term. Furthermore, the performance of a Caesarean section would not clearly prevent the death of the mother or the child in this case; in Jefferson, both the mother and child would almost certainly have survived the performance of a Caesarean section.
It is appropriate here to state that this case is not about abortion. The Supreme Court has made clear that state legislation may not altogether prohibit a woman from making the decision to terminate her pregnancy. Roe, supra, 410 U.S. at 153, 93 S.Ct. at 727. However, when a fetus becomes viable, that is, when the fetus is "potentially able to live outside the mother's womb albeit with artificial aid,"[3]id. at 160, 93 S.Ct. at 730, the state has a compelling interest in protecting the "potentiality of human life," as well as the life and health of the mother. Id. at 162, 93 S.Ct. at 731. Thus, as a matter of law, the right of a woman to an abortion is different and distinct from her obligations to the fetus once she has decided not to timely terminate her pregnancy. Cf. Mathieu, Respecting Liberty and Preventing Harm: Limits of State Intervention on Prenatal Choice, 8 HARV.J. OF L. AND PUB.POL'Y 19, 24 n. 16 (1985) (stating that although a fetus may not have a right to be born, it may have a right to be born with a sound mind and body). With a viable fetus, a balancing of interests must replace the single *615 interest of the mother, and as in this case, time can be a critical factor.[4]
We next view this case within the context of its closest legal analogues: the right of an adult to refuse medical treatment and the right of a parent to refuse medical treatment on behalf of offspring.
A number of courts have explicitly or implicitly recognized the right of individuals to bodily integrity. See, e.g., Superintendent of Belchertown State School v. Saikewicz, 373 Mass. 728, 744-45, 370 N.E. 2d 417, 427 (1977); In re Conroy, 98 N.J. 321, 344-50, 486 A.2d 1209, 1221-23 (1985); In re Colyer, 99 Wash.2d 114, 121-23, 660 P.2d 738, 743 (1983). See also Union Pacific Ry. v. Botsford, 141 U.S. 250, 11 S.Ct. 1000, 35 L.Ed. 734 (1891) ("No right is held more sacred, or is more carefully guarded... than the right of every individual to the possession and control of his own person, free from all restraint or interference of others, unless by clear and unquestionable authority of law."). The right to bodily integrity exists within the penumbral right to privacy guaranteed by the Ninth and Fourteenth Amendments to the United States Constitution. See Bartling v. Superior Court, 163 Cal.App.3d 186, 195, 209 Cal.Rptr. 220, 225 (1984).
The fundamental right to bodily integrity encompasses an adult's right to refuse medical treatment, even if the refusal will result in death. See, e.g., In re Osborne, 294 A.2d 372 (D.C.1972) (adult who refused blood transfusion on religious grounds would not be appointed guardian to give consent to transfusion); In re Melideo, 88 Misc.2d 974, 390 N.Y.S.2d 523 (Sup.Ct.1976) (court declines to order competent, childless, and non-pregnant woman to undergo blood transfusion although she might die in absence of transfusion). But see In re President and Directors of Georgetown College, Inc., 118 U.S.App.D.C. 80, 331 F.2d 1000 (court reverses trial court's denial of hospital's application for permission to administer a blood transfusion to an emergency patient who would die without the transfusion), cert. denied, 377 U.S. 978, 84 S.Ct. 1883, 12 L.Ed.2d 746 (1964). The right of an adult to refuse medical treatment is not absolute, however. The state has four countervailing interests in sustaining a person's life: preserving life, preventing suicide, maintaining the integrity of the medical profession, and protecting innocent third parties. Brophy v. New England Sinai Hospital, Inc., 398 Mass. 417, 431-33, 497 N.E.2d 626, 634 (1986); Saikewicz, supra, 373 Mass. at 740-41, 370 N.E.2d at 425; In re Farrell, 108 N.J. 335, 529 A.2d 404 (1987). The state's interest in preventing suicide is not relevant here, nor is safeguarding the integrity of the medical profession.
The state's interest in preserving life usually will not override an adult's right to refuse medical treatment. See, e.g., John F. Kennedy Memorial Hospital, Inc. v. *616 Bludworth, 452 So.2d 921 (Fla.1984); In re Conroy, supra. In most cases where a court orders an adult to receive medical treatment against his consent, it will be to protect innocent third parties who would be harmed by the adult's decision. See, e.g., In re President and Directors of Georgetown College, Inc., supra, 118 U.S.App.D. C. at 88, 331 F.2d at 1008.
The conclusion we draw from these cases is that in most circumstances, an adult's right to bodily integrity precludes the state from intervening in the adult's decision to refuse medical treatment. The state's interest in the preservation of life, the prevention of suicide, and the integrity of the medical profession, while significant, usually will not overcome the individual's right to bodily integrity.
The state's interest in protecting innocent third parties from an adult's decision to refuse medical treatment, however, may override the interest in bodily integrity. In Prince v. Massachusetts, 321 U.S. 158, 170, 64 S.Ct. 438, 444, 88 L.Ed. 645 (1944), the Supreme Court stated:
Parents may be free to become martyrs themselves. But it does not follow that they are free, in identical circumstances, to make martyrs of their children before they have reached the age of full and legal discretion when they can make that choice for themselves.
Courts have used this reasoning to hold that parents may not withhold life-saving treatment from their children because of the parents' religious beliefs. See, e.g., Jehovah's Witnesses v. King County Hospital Unit No. 1, 278 F.Supp. 488 (W.D. Wash.1967), aff'd, 390 U.S. 598, 88 S.Ct. 1260, 20 L.Ed.2d 158 (1968) (Washington statutes empowering judges to declare children to be dependents for purposes of authorizing blood transfusions of children against parents' wishes were not constitutionally invalid); Muhlenberg Hospital v. Patterson, 128 N.J.Super. 498, 320 A.2d 518 (1974) (court orders blood transfusion for child over parents' objections where lack of transfusion would result in severe and irreparable brain damage). The state may intervene even when a parent's refusal of medical treatment for his or her child does not place the child in danger of imminent death. See, e.g., In re Philip B., 92 Cal.App.3d 796, 156 Cal.Rptr. 48 (1979) (court orders surgery for child with a congenital heart defect over parents' objections), cert. denied, 445 U.S. 949, 100 S.Ct. 1597, 63 L.Ed.2d 784 (1980); In re Custody of a Minor, 375 Mass. 733, 379 N.E.2d 1053 (1978) (court orders chemotherapy for child stricken with leukemia over parents' objections); In re Cicero, 101 Misc.2d 699, 421 N.Y.S.2d 965 (Sup.Ct.1979) (court orders surgery for infant born with spina bifida over parents' objections; court finds that without surgery, child would become handicapped).
Some jurisdictions have held that the doctrine is equally applicable to unborn children. See, e.g., Jefferson, supra; Raleigh Fitkin-Paul Morgan Memorial Hospital v. Anderson, 42 N.J. 421, 201 A.2d 537 (court appoints guardian for fetus and orders guardian to consent to blood transfusions, over mother's objections, as necessary to save the lives of the mother and the fetus), cert. denied, 377 U.S. 985, 84 S.Ct. 1894, 12 L.Ed.2d 1032 (1964); In re Jamaica Hospital, 128 Misc.2d 1006, 491 N.Y. S.2d 898 (Sup.Ct.1985) (court appoints physician as guardian of unborn child and orders him to do all that is necessary to save the life of an 18-week-old fetus, including administering blood transfusions to the mother over her objection); Crouse Irving Memorial Hospital, Inc. v. Paddock, 127 Misc.2d 101, 485 N.Y.S.2d 443 (Sup.Ct.1985) (court orders pregnant woman to receive blood transfusions to protect the welfare of the fetus that was to be prematurely delivered). But see Taft v. Taft, 388 Mass. 331, 334-35, 446 N.E.2d 395, 397 (1983) (court vacates judgment of Probate Court ordering woman in her fourth month of pregnancy to undergo "purse string" operation to prevent miscarriage, holding that the record in the case did not show "circumstances so compelling as to justify curtailing the wife's constitutional rights").
There is a significant difference, however, between a court authorizing medical treatment for a child already born and a child who is yet unborn, although the state *617 has compelling interests in protecting the life and health of both children and viable unborn children. See Roe, supra, 410 U.S. at 163, 93 S.Ct. at 732; Prince, supra, 321 U.S. at 165, 64 S.Ct. at 441. Where birth has occurred, the medical treatment does not infringe on the mother's right to bodily integrity. With an unborn child, the state's interest in preserving the health of the child may run squarely against the mother's interest in her bodily integrity.
It can be argued that the state may not infringe upon the mother's right to bodily integrity to protect the life or health of her unborn child unless to do so will not significantly affect the health of the mother and unless the child has a significant chance of being born alive. Performing Caesarean sections will, in most instances, have an effect on the condition of the mother. That effect may be temporary in otherwise normal patients. The surgery presents a number of common complications, including infection, hemorrhage, gastric aspiration of the stomach contents, and postoperative embolism. 4C Gray, Attorney's Textbook of Medicine, 308.50 (3d ed.1987). It also produces considerable discomfort. In some cases, the surgery will result in the mother's death.[5]
Even though we recognize these considerations, we think they should not have been dispositive here. The Caesarean section would not significantly affect A.C.'s condition because she had, at best, two days left of sedated life; the complications arising from the surgery would not significantly alter that prognosis. The child, on the other hand, had a chance of surviving delivery, despite the possibility that it would be born handicapped. Accordingly, we concluded that the trial judge did not err in subordinating A.C.'s right against bodily intrusion to the interests of the unborn child and the state, and hence we denied the motion for stay.
In conclusion, we observe that the judicial process in this case did not require a physician or the hospital as a separate entity to perform a procedure against an expressed medical judgment. The hospital had sought a declaratory order whether to intervene with surgery given the mother's last-minute objection, an objection for which there may have been one or more reasons. There were physicians willing to operate and staff able to care for the fetus as needed. With the competing legal interests of the mother (some of which would survive her, e.g., D.C.Code § 16-2701 (1981)), and those of the fetus or child (see Greater Southeast Community Hospital v. Williams, 482 A.2d 394 (D.C.1984)), it is understandable why the hospital sought before-the-fact judicial pronouncement of its duties. The balancing of the many factors presented ought, however, to be left to a sort of quasi-official body where the judiciary plays an appropriate and limited reviewing role, rather than the primary adjudicator in a highly charged and short time frame.
Finally, we wish to express our appreciation to counsel and the trial judge for a difficult task well done despite the pressures created by time and tragic circumstances.
NOTES
[*] Judge Nebeker was an Associate Judge of this court at the time of decision. His status changed to Associate Judge, Retired, on September 1, 1987.
[1] Maydun involved a woman whose pregnancy had come to term and whose abnormally long labor placed the fetus at risk of death or brain damage. The woman refused her consent for a Caesarean section to be performed. The Superior Court ordered that the hospital take steps to "protect the birth and safety of the fetus," including a Caesarean section if necessary. Maydun, supra at 2240. This court affirmed by an unreported order. Id.
[2] In Jefferson, a woman in her thirty-ninth week of pregnancy had a complete placenta previa (afterbirth) between the unborn child and the birth canal. Her physicians believed that the condition would not correct itself prior to delivery. If the woman were to attempt a vaginal delivery, there was a 99 percent chance that the fetus would not survive the delivery and a 50 percent chance that the mother would not survive. If a Caesarean section was performed, however, both mother and child would, with almost 100 percent certainty, survive the birth. On the basis of her religious beliefs, the woman refused to permit a Caesarean section to be performed and indicated that she would not consent to any transfusion of blood.

The trial court in Jefferson found that the fetus was capable of sustaining life outside its mother. The child was deemed a viable human being and deemed to be a child without the proper parental care and subsistence necessary for its physical life and health. As a result, custody of the fetus was given to state human resources officials, and the mother of the child was ordered to submit to a Caesarean section if the attending physician found it necessary to sustain the life of the child. The Supreme Court of Georgia denied the parents' motion for stay of the order.
[3] The Supreme Court noted that "[v]iability is usually placed at about seven months (28 weeks) but may occur earlier, even at 24 weeks." Id. at 160, 274 S.E.2d 457.
[4] We likewise reject the contentions of amicus that the Supreme Court decisions in Colautti v. Franklin, 439 U.S. 379, 99 S.Ct. 675, 58 L.Ed.2d 596 (1979), and Thornburgh v. American College of Obstetricians and Gynecologists, 476 U.S. 747, 106 S.Ct. 2169, 90 L.Ed.2d 779 (1986), prohibit a court from ordering a woman to undergo a Caesarean section in order to save the life of a fetus. Colautti involved a statute which made it a crime for a physician to abort a fetus if it might be viable or if there were sufficient reasons to believe that it was viable. In such circumstances, the physician was required to exercise the same care to preserve the life of the fetus as would be required in the case of a fetus intended to be born alive, and the physician was required to adopt the abortion technique providing the best opportunity for the fetus to be aborted alive, so long as a different technique was not necessary in order to preserve the life or health of the mother. The Supreme Court held merely that criminal sanctions may not be imposed on a physician who performs an abortion when the health of the mother conflicts with the well-being of a viable fetus in the absence of a more precise statute.

In Thornburgh, the Supreme Court held that part of a state statute was unconstitutional because it was susceptible to a construction that required a mother to bear an increased medical risk in order to save her viable fetus. Thornburgh, supra, 106 S.Ct. at 2183. The decisions in Colautti and Thornburgh were premised on state legislation which might, in some circumstances, require that the woman's well-being be sacrificed for the life of her viable fetus. This case does not present facts indicating that A.C.'s good health was being sacrificed to save her child's life, although her condition was clearly affected.
[5] The death rate of women upon whom Caesarean sections have been performed is between 0.1 percent and 1 percent, significantly higher than the death rate of women who have delivered their babies vaginally. Id.