736 A.2d 363

Warren R. STEVENSON

v.

Richard A. LANHAM, Sr.

No. 445, Sept. Term, 1998.

Court of Special Appeals of Maryland.

Sept. 1, 1999.

Sonner, J., dissented and filed opinion.

598

**600**

Joseph B. Tetrault (David C. Wright on the brief), Chestertown, for appellant.

Alan D. Eason, Assistant Attorney General (J. Joseph Curran, Jr., Attorney General and Scott S. Oakley, Assistant Attorney General on the brief), Baltimore, for appellee.

Argued before EYLER, SONNER and BYRNES, JJ.

BYRNES, Judge.

Warren R. Stevenson, appellant, an inmate at the Roxbury Correctional Institution who is on a self-proclaimed "hunger strike," challenges a judgment by the Circuit Court for Washington County declaring that Richard A. Lanham, Sr., the Maryland Commissioner of Correction, appellee, may in the future use medically reasonable force to administer "sustenance and medical care" to him over his objection if necessary to prevent physical harm or death, so long as he is confined. Appellant presents the following questions for review, which we have rephrased:

 I. Did the circuit court err in declining to dismiss appellee's declaratory judgment action for mootness?

 II. Did the circuit court err in granting a permanent injunction?

For the reasons explained below, we conclude that there was no justiciable controversy before the lower court when the declaratory judgment was entered. Accordingly, we answer

the first question presented affirmatively and vacate the judgment. We do not reach the second question presented.

## FACTS AND PROCEEDINGS

In 1989, appellant began serving a sentence of twenty-five years without the possibility of parole for a burglary conviction. At first, he was incarcerated in the Maryland House of Correction Annex, in Jessup. On January 1, 1994, while housed at Jessup, appellant went on a "hunger strike" to protest his sentence. His version of a hunger strike is to abstain from eating all solid foods and liquid nutritional supplements, such as "Ensure," and to take in only fluids, such as milk, fruit juices, coffee, tea, and water.

While at Jessup, appellant asked the prison authorities to supplement his meal trays with extra containers of milk and juice. They agreed to do so and for slightly more than three years appellant continued on his liquid diet hunger strike, drinking the fluids that were routinely provided with his meals and the supplemental servings of milk and juice that were being given to him specially. He did not experience any health problems during that time.

On March 7, 1997, appellant was transferred from Jessup to the Roxbury Correctional Institution ("RCI"), in Hagerstown. He was still on his hunger strike. Upon arrival at RCI, appellant asked to be given the same "liquid diet" that he had received at Jessup, i.e., to be furnished additional servings of milk and juice with his meal trays. Dr. Mohamed Moubarek, the associate medical director for RCI, denied appellant's request as being without a medical basis. Appellant continued his hunger strike nevertheless, refusing solid food and drinking only the liquids provided to all prisoners with their meals.

On July 24, 1997, Dr. Moubarek and several medical and psychiatric health care providers held a "patient management conference" with appellant. They warned him that his continued refusal to take in solid food was jeopardizing his health and reiterated that his requests for extra liquids such as milk and juice were not medically indicated. They urged appellant

to start eating a normal diet. Appellant responded by stating that his intention in continuing his hunger strike was not to kill himself, but to express a point.

Despite ongoing requests by members of the RCI medical staff for appellant to relent and start eating solid food, appellant remained on his hunger strike. He continued to ask that his meals be supplemented with extra servings of milk and juice, and the medical staff continued to deny his requests. When it became apparent that appellant was losing weight, the medical staff started to monitor his condition by performing routine weight checks and urine and blood tests and by conducting periodic interviews to confirm that appellant was competent. From June 28, 1997 to December 8, 1997, appellant's weight dropped from 121 pounds to 107 pounds. At 107 pounds, the medical staff considered that he was severely underweight.[1]

On December 12, 1997, during a routine weight, urine, and blood check at the RCI dispensary, appellant suddenly lost consciousness. Members of the medical staff initiated emergency measures, including administration of intravenous fluids and dextrose. They performed blood tests that revealed that appellant's blood chemistry was abnormal, and that it evidenced malnutrition. Appellant's physical condition by then was consistent with malnutrition: in addition to his substantial weight loss, he was suffering gross muscle wasting, mild loss of skin tone, and dry lips. In addition, his heart rate, body temperature, and blood pressure were abnormally low.

Appellant slowly regained consciousness after a few hours. The next day, appellee, in his capacity as Maryland Commissioner of Correction, filed an application for temporary restraining order and preliminary and permanent injunctions and an action for declaratory judgment against appellant, in the Circuit Court for Washington County. Appellee requested *inter alia* that the court issue a temporary restraining

---

1. The record does not contain any information about appellant's height or about his ideal or proper weight.

order, pursuant to Md. Rule 15–504, "requiring [appellant] to submit to the medically appropriate administration of life-essential nutrition and medical treatment necessary to avoid permanent injury or death, and authorizing the Commissioner and his employees and agents to use reasonable force to administer life-essential nutrition and medical treatment over the objection and resistance of [appellant]." The complaint was supported by an affidavit by Dr. Moubarek, in which he opined that, without medical intervention, appellant likely would sustain serious and permanent bodily harm within seven days, and an affidavit by Richard A. Lanham attesting that appellant's self-induced death would cause disruption and low morale in the prison population.

The court granted the temporary restraining order, *ex parte*, upon a finding that before an adversary hearing could be held, appellant's refusal to submit to medical treatment and continued refusal to eat would bring about his death or would cause serious and irreversible bodily harm, and that appellant's death would cause irreparable harm to appellee, in his official capacity, "due to the disruption to the operation of the Division [of Correction] caused by the voluntary starvation of an inmate committed to the custody of the Commissioner." The temporary restraining order required appellant to submit to medical treatment necessary to support his life and to prevent permanent physical injury. It authorized appellee or his agents to use reasonable force to administer sustenance and medical treatment to appellant, over his objection and resistance. By its terms, the temporary restraining order was to expire on December 23, 1997.

Immediately upon the issuance of the temporary restraining order, the RCI medical staff inserted a nasogastric ("NG") tube into appellant's nose and esophagus through which they began administering liquid nutrition to him. Appellant was still being "tube fed" in this manner on December 19, 1997, when appellee filed a motion for preliminary injunction or, in the alternative, for extension of temporary restraining order. In that filing, appellee alleged that appellant's general state of health had improved since the initiation of tube feedings; that,

in Dr. Moubarek's opinion, appellant's health would decline if the tube feedings were discontinued; and that death or serious injury to appellant would cause irreparable harm to important state interests, including the state's interest in preserving life and maintaining the orderly operation of its prison system.

On December 20, 1997, appellant filed an opposition to the motion for preliminary and permanent injunction and an answer to the declaratory judgment action. Three days later, the court issued a memorandum opinion and order extending the effective period of the temporary restraining order until midnight, January 2, 1998, and scheduling a hearing on the request for preliminary injunction for January 5, 1998.

At that hearing, Dr. Moubarek recounted the events that had culminated in appellant passing out at the dispensary on December 12, 1997, none of which are in dispute.[2] He also explained the process by which appellant later had been tube fed and opined, based upon his physical examination of appellant the day before the hearing, that appellant's physical condition had improved by virtue of the tube feedings and that he had gained 17½ pounds. Dr. Moubarek explained that the tube feedings had been discontinued when the temporary restraining order expired at midnight on January 2, 1998. He further testified that appellant had ingested "Ensure" that had been offered to him and "extra warm drinks." Finally, Dr. Moubarek opined that if appellant were to return to consuming only the liquid portion of the regular inmate meals, he soon would become malnourished and eventually would deteriorate to the point of once again being in a precarious physical state.

Appellant testified on his own behalf. He explained that his hunger strike was a protest against the Baltimore County State's Attorney's Office; that he did not intend to harm or kill himself by continuing his hunger strike; that he had

---

**2.** Dr. Moubarek testified, in error, that appellant passed out on December 11, 1997, not December 12, 1997.

repeatedly asked the RCI staff to supply him with milk and juice supplements like those he had received at Jessup but that his requests had been denied; and that until the temporary restraining order had issued, he had remained on his hunger strike and had refused to eat any solid food or to drink any nutritional supplements, such as "Ensure." He had found the insertion of the NG tube and the process of being tube fed painful. Once the tube feedings were started and it became evident that they were not going to be discontinued so long as the temporary restraining order was in effect, he relented and drank some "Ensure;" he did so only because he knew that if he did not, he would receive it by tube, which would be painful.

At the conclusion of the January 5, 1998 hearing, the circuit court granted the motion for preliminary injunction by written order that is entitled "Preliminary Injunction" and provides:

ORDERED that, during the pendency of this action for Declaratory Judgment, Defendant Warren R. Stevenson, # 199853 submit to necessary and proper medical treatment to support his life and to prevent permanent physical harm to himself; and it is further,

ORDERED that, during the pendency of this action for Declaratory Judgment, the Commissioner of Correction, his employees and agents, including the Division of Correction's medical service contractors, their employees and subcontractors, may use reasonable force to administer sustenance and medical treatment over the objection and resistance of the Defendant in order to prevent his suffering serious bodily harm or death.

On January 8, 1998, appellant noted an appeal to this Court. Thereafter, the circuit court scheduled an evidentiary hearing for February 18, 1998, on the motion for permanent injunction and the action for declaratory relief.

The parties stipulated that the testimony and evidence introduced during the January 5 hearing would be admitted at the February 18 hearing. The testimony presented during the February 18 hearing for the most part concerned events

that had transpired between January 5 and that date. Dr. Moubarek testified that appellant had remained in the RCI infirmary until the last week of January. His NG tube, which had been removed when the temporary injunction expired on January 2, 1998, had not been reinserted. By the time that appellant was discharged from the infirmary during the last week of January 1998, his nutritional status had improved and he was no longer thought to be in a life-threatening situation. Thereafter, he was seen either once or twice a week in the dispensary for routine weight and blood chemistry checks. The day before the February 18 hearing appellant weighed 131 pounds and his blood chemistry was normal.

Dr. Moubarek further testified that appellant had informed him the week before the hearing that he was supplementing his intake with hot chocolate and other beverages that he was purchasing at the prison commissary. Dr. Moubarek acknowledged that appellant could maintain his weight by drinking "a lot of milks and hot chocolates and sugary stuff." He opined that as of the hearing date, appellant was not in a life-threatening condition. He added, however, that if in the future appellant were to stop drinking liquid supplements and were to revert to drinking only the liquids provided routinely to inmates with their meals, it was likely that his weight would drop steadily until he would once again be in the debilitated condition in which he had found himself in December 1997.

At the close of appellee's case, appellant moved to dismiss the application for permanent injunction and complaint for declaratory judgment on the ground that the controversy between the parties had become moot. Before ruling on the motion, the court observed:

[Appellant] has the right as a competent individual not to eat. The Division of Correction is not going to be found by this Court to have the authority to force feed [appellant] at this point.

*Now the question may be there as to what right the Division [sic] of Correction would have ... or authority would have to force feed and to medicate and to treat*

*therefore in a different set of circumstances than we have now . . .*

\* \* \* \* \*

I want to know what it is that the State will be asking the Court to determine today as far as rights are concerned, responsibilities are concerned and injunctive relief. . . .

(Emphasis supplied). Counsel for appellee responded, implicitly conceding the merits of the motion to dismiss with respect to the request for injunctive relief. He argued:

[W]hat we have is I believe sufficient to support an action for declaratory judgment. We have a live controversy between the parties about the State's interests, vis-a-vis [appellant's] interests, in the circumstance where there is a medical determination that if he does not receive nutrition and sustenance he will . . . suffer irreparable bodily harm or perhaps death.

*So we are asking the Court to declare the rights of the parties under the circumstances where there is a medical determination that his condition is such that he requires sustenance to avoid irreparable harm or death.*

*Now that is not the case at this moment.* But . . . under the principles governing mootness the appellate courts have recognized that where a matter is susceptible for recurrence and where it tends to evade review the Court may appropriately consider . . . a matter even though at a given moment it may be moot.

In this instance, we have a real life example of what happened when [appellant] pursued his course of action up to December. Now since that time he has apparently found some alternative means of keeping his weight up and keeping his electrolytes at an appropriate level, at least not at an emergency level.

But that doesn't mean that the controversy [sic] between the parties is dead. We are not seeking an order of the Court or declaration that the Division of Correction has the

right to force feed [appellant] at this point or at any point where his medical condition doesn't warrant such.

But where his medical condition is such that as I said he faces the risk of irreparable harm or death, then we are asking the Court to declare the rights and obligations of the parties under those circumstances.

(Emphasis added). After commenting, "why shouldn't the . . . rights and obligations be declared in some fashion so that both parties know what their rights are and what their obligations are without having to come back to court on a temporary injunction, preliminary injunction stage again and revisit this same situation over and over and over?," the court denied appellant's motion to dismiss.

Appellant again testified about the point he is attempting to express by refusing to eat and about his physical condition since the January 5 hearing. At the conclusion of the evidence, the court ruled from the bench, finding that the State's interests in maintaining prison security and discipline, in providing medical care to individuals in custody, in preventing suicides or "self deaths," and in preserving the integrity of the health care providers working within the prison system were "vital" and outweighed appellant's "limited or diminished right of . . . privacy and right to freedom of speech." On that basis, it granted appellee's request for declaratory relief.

On February 24, 1998, appellant voluntarily dismissed his appeal of the circuit court's January 5, 1998 preliminary injunction order. Thereafter, on March 3, 1998, the circuit court issued a written order, entitled "Declaratory Judgment," which reads:

ORDERED, under Md. Courts and Jud. Proc.Code Ann, § 3–403(a), that the legal rights of the parties, under only the circumstances set out below, are declared as follows:

1. [Appellee], in his capacity as Commissioner of Correction, through his agents or employees, may administer sustenance and medical care to [appellant] in order to prevent permanent physical harm or death

as a result of [appellant's] failure to consume adequate nutrition.

2. The sustenance and medical care described in this judgment may be administered over [appellant's] objection, if necessary, and using medically reasonable force, if necessary.

3. The sustenance and medical care described in this judgment may be administered only upon a physician's medical determination that such are reasonably necessary to prevent [appellant's] permanent physical harm or death, and may be maintained only for so long as a physician determines medically appropriate.

4. This judgment applies only to periods when [appellant] is confined under the authority of the Commissioner of Correction.

Appellant then filed a notice of appeal specifying that he was challenging the March 3, 1998 declaratory judgment.

## DISCUSSION

### (i)

The Maryland Uniform Declaratory Judgment Act, Md.Code (1974, 1995 Repl.Vol.) §§ 3–401 through 3–415 of the Courts and Judicial Proceedings Article ("C.J."), permits the bringing of an action for the court to "declare rights, status, and other legal relations" of the parties "whether or not further relief is or could be claimed." C.J. § 3–403(a). The declaration of rights that constitutes the final judgment stands by itself and does not call for "executory process or coercive relief." *Davis v. State,* 183 Md. 385, 389, 37 A.2d 880 (1944). Nevertheless, "[f]urther relief based on a declaratory judgment or decree may be granted if necessary or proper." C.J. § 3–412(a). The statutory scheme thus permits a party to bring an action for declaratory judgment and, either in conjunction with that action or in a separate action, request further injunctive relief based on the rights determined by

that judgment. *See Bankers and Shippers Ins. Co. v. Electro Enter., Inc.,* 287 Md. 641, 653, 415 A.2d 278 (1980).

■■■ The "primary objective of the [Declaratory Judgment] Act is to relieve litigants of the rule of the common law that no declaration of rights may be judicially adjudged unless a right has been violated." *County Comm'rs v. Days Cove Reclamation Co.,* 122 Md.App. 505, 517, 713 A.2d 351 (1998) (citation and internal quotation marks omitted). Nevertheless and even though the Declaratory Judgment Act is remedial and "shall be liberally construed and administered," C.J. § 3–402, it is well settled that "the existence of a justiciable controversy is an absolute prerequisite to the maintenance of a declaratory judgment action." [3] *Boyds Civic Ass'n v. Montgomery County Council,* 309 Md. 683, 689, 526 A.2d 598 (1987)(quoting *Hatt v. Anderson,* 297 Md. 42, 45, 464 A.2d 1076 (1983)); *see also Reyes v. Prince George's County,* 281 Md. 279, 287–88, 380 A.2d 12 (1977); *Hamilton v. McAuliffe,* 277 Md. 336, 339–40, 353 A.2d 634 (1976); *Prince George's County v. Board of Trustees,* 269 Md. 9, 12, 304 A.2d 228 (1973); *see also Anne Arundel County v. Ebersberger,* 62 Md.App. 360, 367–68, 489 A.2d 96 (1985); *Rowe v. Chesapeake and Potomac Tel. Co.,* 56 Md.App. 23, 37, 466 A.2d 538 (1983). A controversy is justiciable if it is "live," *i.e.,* it is one in which "there are interested parties asserting adverse claims upon a state of facts which must have accrued wherein a legal decision is sought or demanded." *Boyds Civic Ass'n,* 309 Md. at 690, 526 A.2d 598 (citation omitted).

---

**3.** C.J. § 3–409, entitled "Discretionary relief," provides, in pertinent part, that except in divorce or annulment proceedings,

> [A] court may grant a declaratory judgment or decree in a civil case, if it will serve to terminate the uncertainty or controversy giving rise to the proceeding, and if:
>
> (1) An actual controversy exists between the contending parties;
>
> (2) Antagonistic claims are present between the parties involved which indicate imminent and inevitable litigation; or
>
> (3) A party asserts a legal relation, status, right, or privilege and this is challenged or denied by an adversary party, who also has or asserts a concrete interest in it.

A controversy may not be justiciable because it is not ripe or because it has become moot. Under the ripeness doctrine as applied to actions for declaratory relief, a case ordinarily is not ripe "if it involves a request that the court declare the rights of parties upon a state of facts which has not yet arisen or upon a matter which is future, contingent and uncertain." *Id.* at 690, 526 A.2d 598 (citation, emphasis, and internal quotation marks omitted). The declaratory judgment process is not available to address questions that are not ripe because that would require the courts to render advisory opinions. *See Hickory Point Partnership v. Anne Arundel County,* 316 Md. 118, 130, 557 A.2d 626 (1989); *see also Eberts v. Congressional Country Club,* 197 Md. 461, 465–66, 79 A.2d 518 (1951)(commenting that declaratory judgment is but an advisory opinion if "[t]here is no present controversy, . . . no present claim of right which indicates imminent and inevitable litigation, . . . [and] no challenged or denied legal status, the uncertainty of which a declaratory decree will terminate").

On the other end of the spectrum, a controversy that once was "live" may no longer be so because it has become moot. "A case is moot when there is no longer an existing controversy between the parties at the time it is before the court so that the court cannot provide an effective remedy." *Coburn v. Coburn,* 342 Md. 244, 250, 674 A.2d 951 (1996). "[T]he doctrine of mootness applies to a situation in which past facts and occurrences have produced a situation in which, without any future action, any judgment or decree the court might enter would be without effect." *Hayman v. St. Martin's Evangelical Lutheran Church,* 227 Md. 338, 343, 176 A.2d 772 (1962); *see also Maryland Comm'n on Human Relations v. Downey Communications, Inc.,* 110 Md.App. 493, 512, 678 A.2d 55 (1996). Generally, a case that is moot will be dismissed without a decision on the merits of the controversy unless it presents "unresolved issues in matters of important public concern that, if decided, will establish a rule for future conduct," *Coburn,* 342 Md. at 250, 674 A.2d 951, or the issue presented is "capable of repetition, yet evading review." *See State v. Parker,* 334 Md. 576, 584, 640 A.2d 1104(1994)("[E]ven

if no controversy exists at the precise moment of review, a case will not be deemed moot if the controversy between the parties is 'capable of repetition yet evading review.' ")

In *Anne Arundel County v. Ebersberger, supra,* Judge Wilner explained that the question whether a controversy that is the subject of a request for declaratory relief is "live" hinges upon the state of facts that exist when the court is called upon to declare the parties' rights:

> Whether a justiciable controversy exists depends, of course, on the facts presented to the court. Questions of "ripeness," on the one hand, or "mootness," on the other may be involved. One thing is clear, however: "In a declaratory judgment proceeding, the court will not decide future rights in anticipation of an event which may never happen, but will wait until the event actually takes place, unless special circumstances appear which warrant an immediate decision."

62 Md.App. at 368, 489 A.2d 96 (quoting *Tanner v. McKeldin,* 202 Md. 569, 579, 97 A.2d 449 (1953)). As this passage makes plain, when the facts underlying a controversy do not exist, either because they have not yet arisen or because they have lapsed with the passage of time, a ruling on a request for declaratory relief based on those facts is merely an academic exercise and will not be entertained. *See Liss v. Goodman,* 224 Md. 173, 177, 167 A.2d 123 (1960)("[T]he declaratory procedure should not be used to decide purely theoretical questions or questions that may never arise.") If the issue raised in a declaratory judgment action is not justiciable because it has become moot, is purely abstract, or will not serve a useful purpose or terminate a controversy if resolved, the complaint should be dismissed. *See Post v. Bregman,* 349 Md. 142, 159, 707 A.2d 806 (1998).

With those principles in mind, we turn to the question whether a justiciable controversy existed when the circuit court granted appellee's request for declaratory relief.

(ii)

The parties agree that when appellee filed its action for declaratory judgment and ancillary applications for injunctive relief in December 1997, there was an actual controversy, *i.e.,* there were "interested parties asserting adverse claims upon a state of facts [that had] accrued [about which] a legal decision [was] sought or demanded." *Reyes,* 281 Md. at 288, 380 A.2d 12. That controversy pitted the State's interests in preserving the lives of those in its custody and maintaining order in its correctional institutions against appellant's constitutionally protected privacy right to be free from unwanted medical treatment and his First Amendment right to free expression. Appellant contends that by the time that the declaratory judgment action was tried and decided on February 18, 1998, however, the controversy over the parties' relative legal rights and obligations was no longer "live" because he had abandoned the conduct that was at the heart of the controversy by supplementing his intake so that his health was no longer threatened. He points out that for all intents and purposes, the circumstances existing on February 18, 1998 were no different than they had been for the first three years of his hunger strike at Jessup.

Appellee counters that there yet was a live controversy when the declaratory judgment action was tried and decided because appellant was persisting in his hunger strike. His health had improved only because he had been enjoined from refusing medical treatment in the form of "tube feedings." Moreover, there was no guarantee that appellant would continue his newly adopted practice of supplementing his intake and the evidence established that if he did not do so, his health would rapidly decline until he once again would be in mortal jeopardy.

In *Attorney General v. Anne Arundel County Sch. Bus Contractors Ass'n,* 286 Md. 324, 407 A.2d 749 (1979), the Court of Appeals considered whether after the conduct at issue in an action for declaratory and injunctive relief had been discontinued voluntarily, a justiciable controversy remained. In that

case, school bus operators holding transportation contracts with Anne Arundel County threatened to withhold services when their jointly requested rate hike was deleted from the County's budget. After the County Board of Education obtained an *ex parte* injunction (which later was converted to an interlocutory injunction by consent) restraining the operators from refusing to drive, the circuit court permitted the Attorney General to intervene. The Attorney General then sought a judicial declaration that the operators' conduct in threatening to withhold services to obtain a rate supplement was an unlawful combination or conspiracy in restraint of trade, in violation of state antitrust laws, and a permanent injunction prohibiting the operators from engaging in such conduct for a period of ten years.

The interlocutory injunction expired more than a year before the request for declaratory and permanent injunctive relief was ruled upon by the circuit court. During the period in which the interlocutory injunction was no longer in effect, the operators neither stopped services nor threatened to do so. Indeed, not only did they provide services, they resolved their dispute with the County Board of Education by accepting a rate supplement offered by the Board. Sometime thereafter, the circuit court granted summary judgment in favor of the operators on all claims, on the merits. The Attorney General noted an appeal, and the Court of Appeals took the case before this Court decided it.

The Court of Appeals vacated the judgment, holding that the controversy between the parties had become moot while the case was pending in the circuit court. Commenting that "[a] question is moot if, at the time it is before the court, there is no longer an existing controversy between the parties, so that there is no longer any effective remedy which the court can provide," *id.* at 327, 407 A.2d 749, the Court reasoned that because the operators had abandoned the very acts that the Attorney General had sought to have declared unlawful and to enjoin, there was no effective remedy that could be imposed and the case was moot. *See Parker*, 334 Md. at 584, 640 A.2d 1104 (explaining that a case is not moot if it "presents a

controversy between the parties for which, by way of resolution, the court can fashion an effective remedy"); *Adkins v. State*, 324 Md. 641, 646, 598 A.2d 194 (1991)(Same).

Sixteen years later, in *Insurance Comm'r v. Equitable Life Assurance Soc'y*, 339 Md. 596, 664 A.2d 862 (1995), the Court of Appeals again had occasion to address the question when discontinuation of the conduct at issue in an action for declaratory and injunctive relief renders the matter moot. At the agency level, the Insurance Commissioner ruled that a challenge, under the Equal Rights Amendment to the Maryland Declaration of Rights and certain state anti-discrimination statutes, to an insurance company's use of a gender-based rate structure in pricing its disability income policies became moot when the company ended that practice and sold the disability income policy division of its business. After the agency ruled against the insurance company on other issues, it petitioned for judicial review. The circuit court affirmed the agency's decision on mootness. The Court of Appeals took the case and, in turn, affirmed that ruling. In so doing, the Court concluded that the insurance company's discontinuation of the disputed practice, as a matter of company policy and as a consequence of the sale of the affected portion of its business, ended the controversy between the parties. It reiterated the general rule "against resolving moot issues ... where ... the moot issues involve constitutional questions. This 'Court's established policy is to decide constitutional issues only when necessary.'" *Id.* at 614, 664 A.2d 862 (quoting *Mercy Hosp., Inc. v. Jackson*, 306 Md. 556, 565, 510 A.2d 562 (1986)).

Appellee attempts to distinguish these cases on two grounds: first, that the controversy here, unlike the controversies between the parties in *Attorney General v. Anne Arundel County Sch. Bus Contractors Ass'n, supra*, and *Insurance Comm'r v. Equitable Life Assurance Soc'y, supra*, was not over because appellant was continuing his hunger strike; and second, that our reasoning in *Carroll County Ethics Comm'n v. Lennon*, 119 Md.App. 49, 703 A.2d 1338 (1998), compels the conclusion that while his application for

injunctive relief was rendered moot, his request for a declaratory judgment was not. We disagree.

To properly analyze whether the actual controversy between the parties that existed in December 1997 still existed two months later, we must specify the conduct that gave rise to the controversy. The conduct that was at the root of and essential to the parties' dispute over their relative rights and obligations was appellant's refusal to ingest either a sufficient amount of food or liquid or the type of food or liquid necessary to sustain good health and, ultimately, life. Appellant did not embark upon that course of conduct until he was transferred from Jessup to RCI. Before then, by drinking milk and sugar-containing juices provided to him by the prison authorities, he succeeded in carrying on his hunger strike without jeopardizing his health. Because that limited brand of "hunger strike" did not harm him or threaten to harm him, it did not lead to a need for medical intervention (in the form of tube feedings or other invasive means of forced nourishment), and, in turn, did not give rise to a conflict between appellant's privacy right to refuse medical treatment and the State's right to preserve life and to maintain order in the prison system.

To be sure, when appellant was serving his time at Jessup, it was readily foreseeable that if circumstances were to change so that he no longer was supplementing his intake, either because the authorities there were to stop giving him extra portions of milk and juice or he was to cease obtaining supplemental nourishment elsewhere, or expand his hunger strike, the parties would be at odds over their relative rights and obligations and an actual controversy would exist. Under the circumstances then existing, however, that controversy and the constitutional questions it would generate were merely potential and possible. When appellant continued his hunger strike at RCI without receiving nutritional supplements from the staff or on his own and when he persisted in his behavior until his health and life were in jeopardy, however, the once abstract and theoretical controversy between the parties was realized.

■ We agree with appellant that by the time the declaratory judgment action was tried and decided in February 1998, he had discontinued the very conduct that the declaratory judgment action was brought to address and had reverted to a course of conduct that did not implicate the conflicting rights of the parties. Under the reasoning of the Court of Appeals in *Anne Arundel County Sch. Bus Contractors Ass'n* and *Equitable Life Assurance Soc'y*, the controversy in this case became moot before the circuit court ruled on the request for declaratory judgment. Moreover, our decision in *Carroll County Ethics Comm'n v. Lennon, supra,* does not support appellee's position that the trial court properly ruled on the request for declaratory judgment even though appellant had stopped engaging in the conduct at issue.

In *Lennon,* the Carroll County Ethics Commission removed from office an attorney who was serving on the county planning commission after it found that the attorney's conduct in serving on the commission when he was representing clients in matters before it constituted "malfeasance in office," in violation of the county ethics ordinance. 119 Md.App. at 54–56, 703 A.2d 1338. The attorney brought an action for declaratory and injunctive relief against the Ethics Commission alleging, *inter alia,* that it had misinterpreted the ethics ordinance. The circuit court granted the attorney's request for injunctive relief, thereby reversing the decision of the Ethics Commission, and enjoined the County Commissioners from interfering with the attorney's duties as a member of the planning commission.

The Ethics Commission noted an appeal. Thereafter, the attorney resigned from the planning commission, assured the commission that he would refrain from engaging in any similar conduct in the future, and filed a motion to dismiss the appeal in this Court, asserting that the case was moot. We held that the issue raised in the declaratory judgment action was not moot, and denied the motion.[4] Citing two United States

---

4. We also held that even if the case were moot, it fell under two of the exceptions to the rule against deciding moot issues: 1) it involved a

Supreme Court cases holding that the voluntary cessation of a challenged practice ordinarily will not deprive a court of its power to determine the legality of the practice, we reasoned that even though the attorney's resignation from the zoning and planning commission made his application for injunctive relief moot, it did not make his request for declaratory relief moot. *Id.* at 61, 703 A.2d 1338 (citing *City of Mesquite v. Aladdin's Castle, Inc.*, 455 U.S. 283, 289, 102 S.Ct. 1070, 71 L.Ed.2d 152 (1982), and *United States v. W.T. Grant Co.*, 345 U.S. 629, 632, 73 S.Ct. 894, 97 L.Ed. 1303 (1953)). An examination of those Supreme Court cases and others addressing mootness is instructive.

*City of Mesquite v. Aladdin's Castle, Inc., supra,* concerned the constitutionality of an ordinance governing licensing of coin operated amusement establishments. 455 U.S. at 285–86, 102 S.Ct. 1070. Aladdin's Castle sought to enjoin enforcement of the ordinance on the ground that its requirement that the City's chief of police determine whether an applicant for a license had "any connection with criminal elements" was unconstitutionally vague. The trial court declared the ordinance unconstitutional on that basis and granted the requested injunction. During the pendency of the appeal that followed, the ordinance was amended to delete the phrase at issue. The Supreme Court held that the voluntary repeal of the offending language did not moot the case. Critical to the Court's ruling was its observation that the City of Mesquite not only retained the authority to reenact the ordinance in its original form, but also let it be known that if the case were dismissed for mootness, it would do just that. *Id.* at 289–90 & n. 11, 102 S.Ct. 1070.

In *United States v. W.T. Grant Co., supra,* the defendant and several other companies were sued civilly for establishing interlocking corporate directorates, in violation of federal antitrust laws. 345 U.S. at 630–31, 73 S.Ct. 894. Soon thereafter,

---

matter of public importance that was likely to recur if not decided, *see Lennon,* 119 Md.App. at 60, 703 A.2d 1338, and 2) it was "capable of repetition, yet evading review." *Id.* at 61, n. 5, 703 A.2d 1338.

the interlocks were terminated by board resignations, and the defendants moved to have the complaints against them dismissed for mootness. The lower court granted the motions, and the government appealed. The Supreme Court held that the claims against the corporations were not moot because the defendants were "free to return to [their] old ways" and because there was a "public interest in having the legality of the [challenged] practices settled." *Id.* at 632, 73 S.Ct. 894.

By contrast, in *Hall v. Beals,* 396 U.S. 45, 48, 90 S.Ct. 200, 24 L.Ed.2d 214 (1969)(per curiam), the Supreme Court held that an action brought soon before the 1968 election, challenging the constitutionality of Colorado's statute imposing a six month residency requirement for voter registration and seeking to enjoin its enforcement, was rendered moot when the statute was amended to reduce the residency requirement. Noting that under the statute as amended, the plaintiffs could have voted in the 1968 election, the Court concluded that the case had "lost its character as a present, live controversy of the kind that must exist if [the courts] are to avoid advisory opinions on abstract propositions of law." *Id.; see also Princeton Univ. v. Schmid,* 455 U.S. 100, 102, 102 S.Ct. 867, 70 L.Ed.2d 855 (1982)(per curiam)("We do not sit to decide hypothetical issues or to give advisory opinions about issues as to which there are not adverse parties before us."); *Allen v. Likins,* 517 F.2d 532, 535 (8 th Cir.1975)(concluding that a class action challenging constitutionality of statute under which inmate's children were found to be dependent was made moot by inmate's parole and recovery of custody of her children); *State Farm Mut. Auto. Ins. Co. v. Ormston,* 550 F.Supp. 103, 106 (E.D.Pa.1982)(concluding that a declaratory judgment action as to whether the defendant was entitled to recover uninsured motorist benefits became moot after the defendant voluntarily withdrew his coverage claim without prejudice).

In the case *sub judice,* unlike *City of Mesquite v. Aladdin's Castle, Inc.* and *United States v. W.T. Grant Co.,* and unlike our decision in *Lennon,* the declaratory judgment action did not concern allegedly illegal or improper conduct by a putative wrong-doer who could evade judicial scrutiny of conduct that

he well might resume. Rather, it concerned the competing legitimate, constitutional rights of the parties, not allegedly wrongful conduct. In the latter circumstance, there is no real danger that the cessation of the conduct at issue is a mere contrivance by the putative wrong-doer to avoid a final determination of the illegality of his conduct and possibly to "return to his old ways." *Lennon* stands for the proposition that the voluntary cessation of allegedly illegal or wrongful conduct will not render a declaratory judgment action to determine the illegality or impropriety of the conduct moot. It does not stand for the proposition that a controversy over competing constitutional rights remains alive even after the legal conduct that implicated those rights has ceased, especially when it is unlikely to recur.

By the time that the declaratory judgment ruling was issued in this case, the conduct of appellant that generated the controversy between the parties had ceased and there was no evidence that it would be repeated. The undisputed evidence established that appellant had changed the nature of his hunger strike (albeit without the assistance he had sought from the prison authorities to do so) and that once again he was carrying on the limited kind of "hunger strike" in which he had engaged for three years at Jessup, without any adverse effect on his health. The evidence also established that from the time that appellant first embarked on a hunger strike in January, 1994, he had attempted to do so in a manner that would not endanger his health and that, when permitted to supplement his intake for that purpose, he did so willingly. Nothing in the evidence demonstrated or even suggested that appellant intended to or would stop supplementing his intake in this fashion, or that it would become impossible for him to continue in that practice.

*Hamilton v. McAuliffe, supra,* lends further support to our conclusion that there was no justiciable controversy when the circuit court issued the declaratory judgment in this case. There, the Court of Appeals held that an action for declaratory and injunctive relief brought by a patient against a circuit court judge who, in a prior case, had issued an injunction

authorizing the administration of a blood transfusion to the patient over his objection, did not present a justiciable controversy. 277 Md. at 341, 353 A.2d 634. The appellant-patient, an adult Jehovah's Witness, sustained a gunshot wound. He was told by his treating doctors that without a blood transfusion, he would die. When he refused to be transfused, members of his family filed an emergency petition for guardianship with right to consent to the administration of the transfusion. After conducting an evidentiary hearing from which it found that the patient was competent and that he would die if he were not transfused, the circuit court issued an order authorizing the administration of a blood transfusion to the patient without his consent. The transfusion was given, and the patient lived. He appealed the order to this Court. We held that either the controversy was moot or the order from which the appeal had been taken was interlocutory and not appealable in any event. No application for *certiorari* was filed.

Almost a year later, the patient filed a separate action for declaratory judgment and injunctive relief against the circuit court judge who had ruled on the guardianship petition. He alleged that the ruling in the guardianship case had violated his civil rights under the federal and Maryland constitutions. He asked the circuit court to declare his rights, specify that the order in the guardianship case was erroneous, and enjoin the judge from ever again issuing an order authorizing the administration of a blood transfusion to him without his consent.

The circuit court dismissed the patient's declaratory judgment action on the ground that it did not present a justiciable issue for determination under the Declaratory Judgment Act. The Court of Appeals granted *certiorari* on its own motion and affirmed, holding that "the underlying controversy [had] expired and was no longer justiciable." *Id.* at 341, 353 A.2d 634 (footnote omitted). Noting that the appellant had conceded that any violation of his constitutional rights was not a continuing one and that there was no indication that in the future he would be subjected to a blood transfusion without his consent, the Court observed:

Whether an individual has the right to refuse a blood transfusion necessarily turns upon facts existing at the moment. The declaratory judgment process is therefore ill fitted as a vehicle to declare the rights of parties in future circumstances as yet unknown.

*Id.* (Internal citations omitted).

 The holding in *Hamilton* is instructive both on mootness and ripeness. It teaches that when legal and not wrongful conduct at the heart of an actual controversy between parties does not continue, an action to determine the relative rights of the parties is moot and does not present a justiciable controversy. It also teaches that when a controversy over competing constitutional rights arises out of circumstances that are exquisitely time-sensitive, turning on events that are momentary and fleeting, a declaratory judgment should not be issued in anticipation that circumstances that no longer exist might again exist.

In this case, the circuit court declared the rights of the parties when the controversy between them was moot and when any possible future controversy between them was not yet ripe. The Declaratory Judgment Order of March 3, 1998 is worded in contemplation of future circumstances, when and if they might come to exist, not in light of the circumstances then existing. Indeed, it is tantamount to the grant of injunctive relief in advance of circumstances that might never arise.

### (iii)

Finally, appellee contends that even if the controversy between the parties had become moot by the time of the February 18, 1998 hearing, the circuit court properly exercised its discretion to decide it anyway because the issue it presents is one of public importance that is likely to recur if not decided and because the controversy is capable of repetition, yet evading review. We disagree.

 A court's authority to express its views on the merits of a controversy that has become moot is only to be exercised "in rare instances which demonstrate the most compelling of

circumstances." *Reyes,* 281 Md. at 297, 380 A.2d 12. With respect to the "issue of public importance" exception to the mootness doctrine, Judge Digges, writing for the Court in *Reyes,* explained:

"[T]he better considered and reasoned cases take the view that only where the urgency of establishing a rule of future conduct in matters of important public concern is imperative and manifest, will there be justified a departure from the general rule and practice of not deciding academic questions. They hold that if the public interest clearly will be hurt if the question is not immediately decided, if the matter involved is likely to recur frequently, and its recurrence will involve a relationship between government and its citizens, or a duty of government, and upon any recurrence, the same difficulty which prevented the appeal at hand from being heard in time is likely again to prevent a decision, then the Court may find justification for deciding the issues raised by a question which has become moot, particularly if all these factors concur with sufficient weight."

*Id.* at 300 n. 18, 380 A.2d 12 (quoting *Lloyd v. Supervisors of Elections,* 206 Md. 36, 43, 111 A.2d 379 (1954)).

*Mercy Hosp., Inc. v. Jackson, supra,* provides guidance on this point. In that case, a Jehovah's Witness refused to consent to the administration of a blood transfusion before undergoing a non-elective (but non-emergency) Cesarean section operation. 306 Md. at 557–58, 510 A.2d 562. The hospital orally petitioned the circuit court for the appointment of a temporary guardian of the patient's person with authority to consent on her behalf to any medically necessary blood transfusion. The court denied the requested relief and instead issued an order enjoining it from administering a blood transfusion to the patient. The operation went forward without the patient receiving a transfusion, and the patient and her baby survived. Thereafter, the hospital filed a written petition *nunc pro tunc* for the appointment of a temporary guardian for the patient with authority to consent to a blood transfusion, which was denied. The hospital then appealed to this Court. The patient moved to dismiss the appeal for mootness.

The hospital agreed that the controversy was moot, but argued that it was properly decided under the exception to the mootness doctrine for cases that involve an issue of public importance that is likely to recur. We denied the motion and affirmed the trial court.

The Court of Appeals granted the hospital's writ of certiorari and then dismissed the case for mootness. In rejecting the hospital's argument that the Court exercise its discretion to review the merits of the controversy, Judge Eldridge, writing for a majority of the Court, explained:

> In considering the various interests at stake when a hospital patient declines a medically indicated blood transfusion, any decision must take into account the factual circumstances in which the asserted rights come into play. A ruling on the merits of this case could be so easily distinguished by future litigants that it would afford little guidance to trial judges or parties. Clearly where the answers to moot questions have no general application, we should not answer them.

> \* \* \* \*

> In addition to the general rule against resolving the merits of moot cases, this Court's established policy is to decide constitutional issues only when necessary. This policy is especially strong with regard to difficult constitutional questions not capable of easy resolution. The constitutional issues [presented], involving the Free Exercise Clause of the First Amendment and the right of privacy recognized by the Supreme Court in *Roe v. Wade*, [410 U.S. 113, 155, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973)] are among the most difficult constitutional issues raised in litigation.

*Id.* at 563–65, 510 A.2d 562 (internal citations omitted).

As we have indicated, in this case, the lower court did not conclude that the controversy was moot; it therefore did not exercise its discretion to decide the case under one of the recognized exceptions to the mootness doctrine. For the reasons explained by Judge Eldridge in *Mercy Hosp., Inc. v. Jackson*, however, this case would not be one properly decided

under the mootness exception for issues of public importance, in any event. The case turns on highly particularized facts that are unlikely to recur, and do not implicate a matter of great public concern. Moreover, given that the Department of Corrections has not adopted a uniform policy for handling inmates who embark on hunger strikes—as is evidenced in this case by the different responses to the same conduct that appellant received from the prison authorities at Jessup and at RCI—a decision on the merits of the moot controversy in this case is of such limited effect that it will not clarify or illuminate the difficult constitutional questions involved.

The mootness doctrine exception for controversies that are "capable of repetition, yet evading review" is not applicable here either. In *Weinstein v. Bradford,* 423 U.S. 147, 149, 96 S.Ct. 347, 46 L.Ed.2d 350 (1975) (per curiam), the Supreme Court explained that in the absence of a class action, this exception applies only when the challenged action was too short in duration to be fully litigated before it ceased and there was a reasonable expectation that the same action would be taken against the same party again. The Court held that a prisoner's challenge to a state parole board's procedures had become moot when the prisoner was released and was no longer subject to the board's supervisory power.

In this case, there is no evidence that appellant will resume the type of life threatening hunger strike that he had undertaken for many months before his health crisis of December 1997. Accordingly, there is no reason to believe that the clash of constitutional rights that arose out of that conduct will recur. Moreover, for the reasons we have explained, the controversy was not made moot by the fact that appellant's health improved and he no longer was in mortal jeopardy. It became moot when appellant resumed a "hunger strike" that does not threaten his health. Accordingly, the expediency factor that justifies review under the exception at issue does not apply.

**JUDGMENT VACATED. CASE REMANDED TO THE CIRCUIT COURT FOR WASHINGTON COUNTY WITH**

## DIRECTIONS TO ENTER ORDER DISMISSING ACTION AS MOOT.
### COSTS TO BE PAID BY APPELLEE.

Dissenting Opinion by SONNER, J.

SONNER, Judge, dissenting:

I respectfully dissent. I have no disagreement with the thorough and clear discussion of the law by the majority, but I do disagree that, after applying that law to the facts of this case, we should find the controversy moot and vacate the judgment of the circuit court.

The foundation for the majority's holding is that there is no justiciable controversy to necessitate the issuing of a declaratory judgment. To support its conclusion, the majority relies upon *Hamilton v. McAuliffe*, 277 Md. 336, 353 A.2d 634 (1976), a case in which a member of Jehovah's Witnesses, who had suffered a gunshot wound, refused a blood transfusion. Former Court of Appeals Judge John F. McAuliffe, who was then on the Circuit Court for Montgomery County, after conducting a hearing at the hospital, authorized a transfusion that reduced the risk of death during an emergency operation. After release from the hospital, the recovered patient appealed the interlocutory order that Judge McAuliffe had entered. Judge Robert Murphy, speaking for the Court of Appeals, held that the appellate case was moot. The critically different fact in that case is that there was no possibility for that appellant, beyond that of any Jehovah's Witness, to raise the dispute again. Had the appellant remained in the hospital and subject to further need for transfusions, the controversy would not have been moot, and the hospital would have been in need of some determination by the circuit court for the rights of the respective parties.

The appellant here is the only one who can provide evidence as to whether there will be any repeat of the conduct that generated the controversy. The appellee is without the ability to show that he may be biding his time before he decides to change his diet again. There is nothing in the record to

indicate that he has abandoned using a hunger strike as his means for protesting whatever bothers him about the State's Attorney's Office for Baltimore County. He should not be able to succeed in this appeal simply by desisting, for the time being, the behavior that gave rise to the need for a declaratory judgment, while persisting in his protest. I therefore believe the issues here are not moot, they are likely to arise again, and that we should have reached and decided them on their merits.